**FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for FirstSouth, F.A.**

v.

**DELOITTE & TOUCHE, a Partnership, and Deloitte Haskins & Sells, a Partnership.**

No. LR–C–90–520.

United States District Court, E.D. Arkansas, W.D.

Oct. 1, 1992.

Peter B. Heister, Martha Jett McAlister, Eichenbaum, Scott, Miller, Liles & Heister, P.A., Little Rock, AR, John L. Conlon, Hopkins & Sutter, Chicago, IL, David B. Joeckel, Jr, Hopkins & Sutter, Dallas, TX, Stephen Novack, Marilyn Klawiter, Eric N. Macey, Novack & Macey, Chicago, IL, for F.D.I.C.

Overton S. Anderson, Anderson & Kilpatrick, Little Rock, AR, David C. Wade, Martin, Tate, Morow & Marston, P.C., Memphis, TN, Richard D. Bernstein, Robert D. McLean, Sidley & Austin, Washington, DC, for Deloitte & Touche and Deloitte, Haskins & Sells.

Peter G. Kumpe, Williams & Anderson, Little Rock, AR, for Henry F. Trotter, Jr., FirstSouth F.A.

## ORDER

EISELE, District Judge.

The defendant's motion to dismiss is presently before the Court. The motion has been briefed, supplementally briefed, rebriefed and letter briefed by both sides, and is now more than ready for disposition. For the reasons set forth below, the motion will be granted in part and denied in part.

### I.

Beneath its legal and factual complexity, this is a relatively straightforward professional negligence case.

FirstSouth, F.A. used to be a federally chartered and insured, publicly held savings and loan association.[1] On December 4, 1986, the Federal Home Loan Bank Board declared that FirstSouth was insolvent and appointed the Federal Savings and Loan Insurance Corporation (FSLIC) as the failed thrift's sole receiver.[2] Upon enactment of

---

1. In keeping with the legal standard governing motions to dismiss, the facts presented here are drawn from the plaintiff's First Amended Complaint ("Complaint"). They have not been proven but are merely accepted as true at this stage of the process. The Court's ruling is limited to the instant motion to dismiss. The Court has not converted the motion to dismiss into a motion for summary judgment.

2. This case is only the most recent contribution to what has been accurately described as "a wave of litigation" that has followed from First-

the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), FSLIC was dissolved, and all of its assets, including the FirstSouth receivership, were transferred to the FSLIC Resolution Fund. As the appointed manager of that Fund, the Federal Deposit Insurance Corporation (FDIC) succeeds FSLIC as the receiver for FirstSouth.

FirstSouth hired the national accounting firm of Deloitte Haskins & Sells (DH & S) to perform independent audits of the thrift for three fiscal years preceding FirstSouth's failure (fiscal 1983, 1984, and 1985). In 1989, DH & S merged with Touche Ross, another national accounting firm, creating a single general partnership under the name of Deloitte & Touche. Deloitte & Touche is the legal successor to DH & S.

The FDIC now brings this professional malpractice case against Deloitte & Touche and Deloitte Haskins & Sells (collectively, "Deloitte") to recover "damages in excess of $400 million arising from DH & S's negligent performance of audits at FirstSouth." First Amended Complaint ("Comp.") at ¶ 1. The FDIC summarizes its claim as follows:

> If DH & S had conducted competent audits of FirstSouth and had submitted proper reports, the institution's outside directors and regulators would have been informed of FirstSouth's serious problems and could have taken timely remedial action. DH & S deprived FirstSouth and federal regulators of material information thereby permitting imprudent transactions to continue unchecked and losses from them to mount. The defendants are liable for losses arising from transactions which FirstSouth would not have engaged in if DH & S had done its job right.

Comp. at ¶ 3. The Complaint then goes on, at considerable length, to describe particular transactions that demonstrate Deloitte's negligence. The FDIC explains, however, that the events it mentions in its Complaint do not comprise an exhaustive list, but merely represent examples of the kind of malpractice that DH & S committed in providing accounting services to FirstSouth.

Deloitte's position, in essence, is that the FDIC's Complaint pleads facts which, if accepted as true, conclusively demonstrate that FirstSouth's own conduct, and not that of its professional advisors, caused the thrift's losses. According to Deloitte, it cannot, as a matter of law, be held liable for failing to tell FirstSouth what FirstSouth already knew, or for the results of actions that FirstSouth would have taken regardless of, or even in spite of, what its accountants said. From that simple and sensible premise, Deloitte fashions a proximate cause argument and a comparative fault argument. Whichever principle of tort law the defendant invokes, however, its arguments follow from the same basic idea: the FDIC—which, as FirstSouth's receiver, can only bring claims that would be available to the thrift—cannot show that Deloitte is legally responsible for the losses described in the Complaint, because the facts the Complaint alleges show that FirstSouth deserves all, or at least most, of the credit for causing its own problems. The defendant also argues that the plaintiff's claims based on work performed for the 1983 audit are barred by the applicable statute of limitations.

## II.

Deloitte has moved for dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure, arguing that the FDIC has failed to state a claim for which relief may be granted. In considering this motion, the Court will construe the Complaint favorably to the plaintiff and accept its allegations as true. *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45, 78 S.Ct. 99, 101, 2 L.Ed.2d 80 (1957).

## III.

The first question that the Court must address is always important but rarely so

---

South's failure. *American Casualty Co. of Reading, Penn. v. FSLIC,* 704 F.Supp. 898, 899 and n.

1 (E.D.Ark.1989) (Woods, J.) (listing related civil cases).

difficult: who, or what, exactly, is the plaintiff?

According to the FDIC, it "brings this action as Receiver for FirstSouth for the benefit of FirstSouth and its depositors and creditors." Comp. at ¶ 10. Thus, the FDIC purports to represent a collection of interests and entities. Deloitte has objected to this multiple personality approach, arguing that the FDIC is nothing more than the thrift's receiver, and cannot represent anyone or anything other than the legal interests of FirstSouth. The import of this dispute is plain. If the FDIC can take the form of creditors and depositors, it might be able to distance itself from any misconduct of FirstSouth's management that may have at least contributed to the losses for which it is trying to hold Deloitte responsible.

In its recent decision *FDIC v. Ernst & Young*, 967 F.2d 166 (5th Cir. Aug. 3, 1992), the U.S. Court of Appeals for the Fifth Circuit recognized the significance of this question of plaintiff identity. In *Ernst & Young*, the FDIC, as receiver for a failed savings and loan association (Western Savings Association), sued the S & L's accountants—Arthur Young & Company and its successor, Ernst & Young ("EY")—for negligence and breach of contract. The theory of the complaint was very similar to the one the FDIC has presented here. As the Fifth Circuit described it: "The FDIC alleges that Western suffered $560 million in damages resulting from Arthur Young's audits because if the audits had been accurate, Western's board of directors or government regulators would have prevented further losses." *Ernst & Young*, 967 F.2d at 169. In concluding its summary of the case, the Fifth Circuit commented:

> Critically important to the ultimate resolution of the case is the FDIC's decision to bring this suit only as assignee of a claim by Western against the auditors. The

FDIC has authority to sue EY in its own behalf or on behalf of Western's creditors, but it chose not to do so.

*Id.* Here, like in *Ernst & Young*, it is "critically important" to determine who and what the FDIC represents in this case. The FDIC is not attempting to bring this action on its own behalf as a government agency; it does not claim to represent the legal interests of regulators, insurers, or the American public. Unlike its posture in *Ernst & Young*, however, the FDIC has asserted that it is suing on behalf of an S & L's creditors, as well as its depositors.

The parties have confined their arguments addressing this issue to the question of whether the FDIC possesses the statutory power to bring this action on behalf of FirstSouth's depositors and creditors. Deloitte contends that FSLIC had no such authority, and that the FDIC, because it inherited an existing, pre-FIRREA receivership, cannot claim new powers—such as an ability to represent creditors and depositors—that it only acquired from the enactment of the 1989 legislation. The FDIC has responded that under 12 C.F.R. §§ 548.2(f) and 549.3(a), regulations that were in effect when FirstSouth went into receivership, FSLIC did in fact have the power to "institute ... any legal proceeding ... and in every way to represent the association, its members and creditors." Sup.Res. at 21 n. 7. FIRREA, the FDIC argues, only provided statutory affirmation of a power that had already been exercised pursuant to valid, existing regulations.

 The regulations the FDIC cites do in fact authorize receivers (and conservators) of federal associations to represent the associations' creditors and members. However, even given the authority to do so, the Court has concluded that under Arkansas law,[3] the

---

**3.** Jurisdiction over this case is not based on diversity of citizenship. At the same time, professional negligence is not a federal question, and the Court must look to state law for a rule of decision to resolve several of the issues that have arisen in this case. In addressing those issues, the Court will apply the law of Arkansas. Federal district courts applying state law follow the choice of law principles of the state in which

they are located. *See Klaxon v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In a tort action involving an Arkansas resident, such as FirstSouth, and a resident of another state, such as Deloitte, Arkansas courts apply the law of the state with "the most significant relationship" to or "most significant interest" in the resolution of the issue at stake. *See Schlemmer v. Fireman's Fund Insur-*

FDIC has not stated a viable claim on behalf of creditors or depositors in this case. In *Robertson v. White*, 633 F.Supp. 954 (W.D.Ark.1986), a district court applying Arkansas law noted that "[a]s a general rule, an accountant is liable to persons not in privity with him only for fraudulent misrepresentations, not for negligent ones." *Id.* at 970. Under this general rule—which is sometimes referred to as the "*Ultramares* exception" because of its creation by Chief Judge Cardozo in *Ultramares Corp. v. Touche*, 255 N.Y. 170, 174 N.E. 441 (1931) [4]—third parties to a client-accountant relationship cannot sue the accountant for negligence, even if they have suffered harm as a result of their reliance on the accountant's work. In limiting accountants' liability for negligence to those with whom an accountant is in privity, Chief Judge Cardozo explained:

> If liability for negligence exists, a thoughtless slip or blunder, the failure to detect a theft or forgery beneath the cover of deceptive entries, may expose accountants to liability in an indeterminate amount, for an indeterminate time to an indeterminate class. The hazards of a business conducted on these terms are so extreme as to enkindle doubt whether a flaw may not exist in the implication of a duty that exposes to these consequences.

*Ultramares*, 174 N.E. at 444.

Not all jurisdictions have followed this rule. Under New Jersey law, for example, accountants owe a duty to all foreseeable users of audits who rely on the audits to their detriment. *See H. Rosenblum, Inc. v. Adler*, 93 N.J. 324, 461 A.2d 138 (1983); *see*

*also* Wiener, *Common Law Liability of the Certified Public Accountant for Negligent Misrepresentation*, 20 San Diego L.Rev. 233, 260 (1983) (advocating New Jersey approach because it (1) serves "the dual functions of compensation for injury and deterrence of negligent conduct" and (2) promotes fairness by treating accountants like other parties sued for negligence).

The Restatement takes a middle-ground approach, under which an accountant owes a duty (1) to third parties which the accountant intends, or knows the client intends to supply with information, and (2) to a limited group of unknown third parties—those injured in reliance on an audit in a transaction which the accountant intended to influence by its audit, or knew that its client intended to influence by the audit. *See* Restatement (Second) of Torts, § 552; *see generally*, Gromley, *The Foreseen, the Foreseeable and Beyond, Accountants' Liability to Non–Clients*, 14 Seton Hall L.Rev. 528 (1984).

■ The *Robertson* court recognized that other states and some "academic opinion" (including that of the American Law Institute) had rejected *Ultramares*, and that third parties had recently "enjoyed a limited measure of success" in bringing negligence claims against accountants. *Robertson*, 633 F.Supp. at 954 (citing cases). Notwithstanding this movement away from the traditional rule, however, *Robertson* held that it remained the law in Arkansas. No Arkansas court or federal court applying Arkansas law has reached a different conclusion since.[5]

---

ance Co., 292 Ark. 344, 730 S.W.2d 217, 219 (1987); *Williams v. Carr*, 263 Ark. 326, 565 S.W.2d 400, 403–04 (1978) (en banc). There is no need to discuss or even to mention the five "choice influencing considerations" that guide Arkansas courts their search for the state with the most significant relationship or interest. This is a professional negligence case brought by the receiver of a failed Arkansas thrift against an accounting firm that did work for the thrift out of its Arkansas offices. Arkansas is the only contender here. No other state has a comparable interest in applying its law to any aspect of this dispute of which the Court is presently aware. While the parties have not conceded this point, they have not suggested otherwise, and they rely on Arkansas law in making their state law arguments. The Court therefore concludes that when

a state rule of decision is called for, Arkansas law will apply.

4. The defendant in *Ultramares* was George A. Touche, a partner in the accounting firm of Touche, Niven & Co. The Court does not know, but would not be entirely surprised, if George is the Touche in Deloitte & Touche. If he is, his contributions to the firm have included a valuable defense to liability for negligence.

5. In April of 1987, the Arkansas legislature enacted a statute addressing this issue. *See* Ark. Stat.Ann. § 16–114–302 (1987 & Cum.Supp. 1991). The law moves the State somewhat closer to the Restatement position, but still affords accountants a significant amount of protection from liability to third parties. It states that an

*Robertson,* then, is controlling authority in this case, and the *Ultramares* rule applies.

▮ The parties have focused their arguments on the availability and effect of defenses based on notions of proximate cause or comparative fault. Taking a step or two back in the elements of a tort case, however, the FDIC's negligence claim cannot survive without the existence of a cognizable duty of care. And under Arkansas law, DH & S only owed such a duty to a party with whom it was in privity.[6] The plaintiff has not alleged that Deloitte was in privity with anyone but its client, FirstSouth.[7] Thus, regardless of the FDIC's power to bring suit "for the benefit of" depositors and creditors, the Court must dismiss any claim for negligence that did not originally belong to FirstSouth.[8]

▮ This legal conclusion provides a significant part of the answer to the question of who or what the plaintiff is in this case. The FDIC may or may not occupy precisely the same legal position that FirstSouth would have occupied in bringing this suit. The Court has not made that determination. What has been decided, however, is that the

---

accountant shall not be liable to persons with whom the accountant is not in privity of contract for "civil damages resulting from acts, omissions, decisions, or other conduct in connection with professional services," except for:

> (1) Acts, omissions, decisions or conduct that constitutes fraud or intentional misrepresentations; or
>
> (2) Other acts, omissions, decisions, or conduct if the [accountant] was aware that a primary intent of the client was for the professional services to benefit or influence the particular person bringing the action. For purposes of this subdivision, if the [accountant]:
>
> (A) Identifies in writing to the client those persons who are intended to rely on the services, and
>
> (B) Sends a copy of the writing or similar statement to those persons identified in the writing or statement,
>
> then the [accountant] may be held liable only to the persons intended to so rely, in addition to those persons in privity of contract with such [accountant].

The Court follows *Robertson, supra,* instead of this statute because the State legislature expressly stated that the subchapter in which the statute appears "shall only apply to acts, omissions, decisions, or other conduct in connection with professional services occurring or rendered on or after April 6, 1987." Ark.Stat.Ann. § 16–114–301 (1987 & Cum.Supp.1991). FirstSouth went into receivership in December of 1986; therefore, Ark.Stat.Ann. § 16–114–302 does not apply to the events giving rise to this suit.

6. Interestingly, in the section of its Complaint entitled "DH & S's DUTIES," the FDIC only lists duties which the accountants owed to First-South; it does not suggest that DH & S owed an independent duty to depositors or creditors. Nor has the FDIC claimed that such a duty exists in arguing against the motion to dismiss. In its Opposition to Defendant's Motion to Dismiss, for example, the plaintiff states:

> DH & S owed a duty to FirstSouth to exercise independent judgment and the level of care, diligence and prudence expected of professionals, and to report any respect in which First-

South's financial statements were not fairly presented and any matter which threatened FirstSouth's continued operations. Further, DH & S had a duty to plan and supervise field work, and to properly evaluate the institution's internal controls to determine whether the controls were reliable.

Opp. at 3–4 (citations to Comp. omitted). Again, the FDIC does not mention any duty that Deloitte owed to third parties such as creditors or depositors.

7. *Ultramares* rule does permit non-privies to sue an accountant for fraudulent misrepresentation. The legal availability of a fraud claim is not an issue here. As the first paragraph of its Complaint clearly states, the FDIC is suing Deloitte for damages "arising from DH & S's negligent performance of audits at FirstSouth." The Complaint does not state a claim for fraud. (Claims for fraud are relatively easy to recognize in light of the special pleading requirement established by Rule 9(b). The Complaint does not mention fraud, let alone plead it with particularity.)

> The FDIC does "plead" fraud in its response to Deloitte's Motion to Dismiss, but only in order to oppose Deloitte's statute of limitations argument. All procedural problems aside, in arguing against a possible limitations bar, the FDIC contends, as it must, that DH & S fraudulently concealed the accounting errors that are the basis for this negligence action. Neither the Complaint nor the plaintiff's arguments ever suggest that the defendant committed an independent, actionable fraud against FirstSouth's creditors or depositors.

8. Of course, any number of people might "benefit" if the FDIC prevails in this suit. Those standing to gain from a plaintiffs verdict may include FirstSouth's depositors and creditors, as well as the taxpaying public. Whoever the FDIC is seeking to benefit, and wherever the proceeds of an award might go, the Court has only decided whose legal rights may be asserted here. At the most, creditors and depositors will be interested onlookers. Under the *Ultramares* rule, they cannot be parties, and the FDIC cannot represent them as such.

FDIC will not be able to distinguish itself from FirstSouth through its power to represent the thrift's creditors and depositors. The FDIC has tried to do what it elected not to do in *Ernst & Young, supra,* but Arkansas law will not permit it to succeed. As a result, what the Fifth Circuit said at the outset of its discussion in *Ernst & Young* can also be said here: "[T]he effect of the auditor's alleged negligence on third parties is legally irrelevant to the determination of the present case." *Ernst & Young,* 967 F.2d at 169.

### IV.

Next, the Court will consider Deloitte's proximate cause and comparative fault arguments.

#### A. *Proximate Cause and the Imputation Issue*

▮ Deloitte argues that even if it was negligent in performing the FirstSouth audits, its negligence could not have been the proximate cause of the losses the FDIC describes in its Complaint. This is a very difficult but not impossible position to maintain. Causation is a question of fact normally reserved for the trier of fact. *See* AMI Civil 3rd 501–503 (citing cases). Deloitte argues, however, that the allegations set forth in the Complaint, if accepted as true, establish that FirstSouth knew everything that Deloitte allegedly failed to tell it; as a matter of law and logic, the defendant reasons, Deloitte's negligence could not have caused FirstSouth's losses, because perfect accounting would have only given FirstSouth a more accurate restatement of the information it actually knew and used to make the decisions that resulted in its failure.

In order to accept this argument, the Court would have to be persuaded, under the standard governing Rule 12(b)(6) motions: first, that certain individuals at FirstSouth already knew what Deloitte allegedly failed

to tell it; second, that the knowledge those individuals possessed must, under the principle of imputation, be viewed as knowledge held by the thrift; and third, that the FDIC as the thrift's receiver, must occupy the same position that FirstSouth would occupy, and thus be subject to the same defenses that Deloitte could assert against its former client, if FirstSouth had brought this claim.[9]

Deloitte cannot accomplish the first of these three tasks. In the Court's view, the FDIC's allegations fail to establish that DH & S did not tell FirstSouth anything that FirstSouth did not already know. Undoubtedly, the individuals at FirstSouth conducting the transactions described in the Complaint knew what they were doing. The Court accepts the FDIC's argument, however, that knowledge of particular transactions is not necessarily the same thing as knowledge of the thrift's overall financial condition. *See* FDIC's Supp.Res. at 9; Feb. 27 Opp. at 6. Even if a single individual perpetrated each of FirstSouth's many wrongs, that person may not have known the aggregate effect of his actions on the thrift's well-being. Moreover, a person might know the general effect of a given act without being aware of exactly how the act has harmed or helped his company. For example, an officer who arranges to park a problem loan will know that the deal will create an inaccurate impression of higher profits and lower reserve requirements. That general understanding could be enough to motivate the officer's actions. Accountants discovering and reporting the transaction, however, could inform the officer of precisely how inaccurate of an impression he had created.

Thus, even if the knowledge of every FirstSouth employee involved in the events that caused the thrift's losses is imputed to FirstSouth, a possibility remains that DH & S's audits communicated new information to its client—or at least would have communicated new information if they had been competent-

---

9. Imputation moves knowledge from an agent to a corporation, not from a failed thrift to its receiver. Thus, through the principle of imputation, FirstSouth might legally acquire the knowledge of Howard J. Weichern, Jr., a man who held top management positions during the time DH & S was performing its audits. The knowl-

edge that FirstSouth is viewed as acquiring from Mr. Weichern, however, will not, as has been suggested, be "imputed" to the FDIC. If the FDIC is held accountable for FirstSouth's knowledge, it will be through principles of receivership, not through principles of agency and corporations law.

ly done. In *Ernst & Young*, where the defendant-accountants prevailed on a motion for summary judgement, the undisputed facts showed that the "dominating sole owner" of Western Savings "was cognizant of the [S & L's] financial condition." *Ernst & Young*, 967 F.2d at 170, 172. Because that cognizance was imputable to Western, the court concluded that the thrift could not have relied on its accountants' audits and that the audits could not have proximately caused Western's losses. *Id.* at 170–72. In this case, the FDIC has not alleged that anyone at FirstSouth was cognizant of the thrift's financial condition, nor does such a conclusion necessarily follow from the allegations set forth in the Complaint. Consequently, the Court cannot conclude that the FDIC has failed to state a claim for negligence for the reason that Deloitte did not, as a matter of law, proximately cause FirstSouth's losses.

Deloitte and the FDIC have advanced different positions regarding (1) the extent to which certain individuals' knowledge should be imputed to FirstSouth and (2) the extent to which the FDIC should be held accountable for that knowledge. The Court need not take up these issues here. Nonetheless, the Court hopes to focus future discussion and perhaps to narrow the scope of what will assuredly be an extremely burdensome discovery process for both sides.

■ In Arkansas, as elsewhere, "A corporation must necessarily act through agents, and the universal rule is that knowledge of an agent is ordinarily to be imputed to the principal." *Little Red River Levee District No. 2 v. Garrett*, 154 Ark. 76, 82, 242 S.W. 555 (1922); [10] *see also, e.g., Hill v. State*, 253 Ark. 512, 521–22, 487 S.W.2d 624, 631 (1972) (citing Arkansas cases articulating general rule of imputation). This universal rule, however, also has a universal exception: an agent's knowledge will not be imputed to a corporation where the agent is acting against the corporation's interests and for his own. Additionally, imputation may not be appropriate in cases where the relevant knowledge is held by an agent who does not exercise a sufficient degree of control over the corporation's affairs. *Cf. United States v. Little Rock Sewer Committee*, 460 F.Supp. 6 (E.D.Ark.1978) (questioning whether knowledge of lower level employee would be imputed to corporation for purposes of criminal prosecution).

This case will require the Court to define and to apply the "adverse interest exception" to the general rule of imputation under Arkansas law. The FDIC argues that because controlling inside officers at FirstSouth—specifically, Mr. Weichern and Roderick D. Reed [11]—acted "contrary to interests of FirstSouth," Comp. at ¶ 3, their knowledge should not be imputed to the thrift. Deloitte argues that while the controlling officers' actions may have ultimately harmed First-South, those actions were taken for the thrift's immediate benefit; although outsiders such as creditors and investors may have been victimized, Deloitte suggests, First-South was the direct beneficiary of its officers' wrongdoing, at least in the short term, and therefore imputation is appropriate here. This argument relies on the proposition that "[f]raud on behalf of a corporation is not the same thing as fraud against it," which is drawn from the Seventh Circuit's well-received decision *Cenco, Inc. v. Seidman & Seidman*, 686 F.2d 449 (7th Cir.), *cert. denied*, 459 U.S. 880, 103 S.Ct. 177, 74 L.Ed.2d 145 (1982).

---

**10.** *Little Red River* goes on to state: "[B]ut there is an exception to that rule, such that knowledge of the agent will not be imputed to the principal where the agent acts for himself or has a personal interest in the transaction, thus rendering it improbable that he will report his knowledge to his principal." 154 Ark. at 78, 242 S.W. 555. The rule does not end there, however, because the "exception fails where the officer of the corporation is its sole representative, and especially where, as in the present case, the officer is the corporation itself, without accountability to any superior." *Id.* The Court discusses the "adverse

interest" exception to the general rule of imputation, as well as the significance of an agent's control over the principal's conduct, below. Interestingly, *Little Red River* raises these issues. The Court is not suggesting that the case sets forth the operative standard under Arkansas law.

**11.** At various times, Mr. Weichern served as FirstSouth's president, as chairman of the board, and chief executive officer. Mr. Reed held the positions of chief operating officer, executive vice president, and president. *See* Comp. at ¶ 2.

Courts following *Cenco* have reasoned that even when officers ultimately ruin their companies—which occurs when they are caught and punished for their wrongs—their knowledge should still be imputed to the corporations, because otherwise those who previously benefitted from the misconduct would be able to escape responsibility for it. *See id.* at 456 (imputing knowledge of top managers to company because fraud was committed on behalf of corporation, even though "when the fraud was unmasked, [Cenco's] market price plummetted by more than 75 percent"); *see also Ernst & Young,* 967 F.2d at 170–71 (following Texas law, which follows *Cenco,* to impute knowledge of S & L's dominant owner-officer to S & L, and not applying adverse interest exception even though officer put S & L into insolvency by pursuing unwise and illegal practices); *Seidman & Seidman v. Gee,* 625 So.2d 1 (Fla.Dist.Ct.App.1992) (following *Cenco* and other Illinois decisions, imputing knowledge to corporation because "short-term benefit" was the important factor, not "ultimate financial demise."). *But see, FDIC v. O'Melveny & Meyers,* 969 F.2d 744 (9th Cir.1992) (appearing not to consider possible short-term benefits of wrongdoing in deciding against imputation, and looking instead to ultimate adverse effect of officers' actions).

*Cenco* is a leading case in defining the scope of the adverse interest exception to the general rule of imputation; it is especially helpful in situations where the actions of top managers might be viewed as either beneficial or harmful to their companies, depending on the point of view one takes. *Cenco,* however, was decided by a federal court making an effort to predict how Illinois law would treat that case. Several states have adopted *Cenco* as their own, but, to the Court's knowledge, Arkansas has not. *Cenco*'s popularity in other jurisdictions is not surprising, however. The decision is well-reasoned, and the Seventh Circuit was guided by "the underlying objectives of tort liability," [12] and not by any unique or controversial principles of Illinois law, in rendering it. *Cenco,* then,

along with a few other decisions courts often cite in discussions of the adverse interest exception,[13] will assist the Court in determining whether individuals like Mr. Weichern and Mr. Reed were acting adversely to the interests of FirstSouth in such a way as to shield the thrift from their knowledge. This issue will still be decided, however, under Arkansas law. The parties should make further efforts to locate Arkansas cases showing how courts in this state have dealt with comparable questions. If no such cases exist, that fact should be acknowledged before resorting to the general objectives of tort liability.

Additionally, *Cenco* and cases like it show that in order to define the scope of the adverse interest exception in cases such as this, courts require a much more complete factual record than the one that presently exists in this case. The *Cenco* court, in fashioning a rule that would best compensate victims and deter wrongdoing, carefully considered the way that alternative approaches would affect the parties involved in that law suit; the facts of the case helped to inform the Court of the kinds of interests that should be considered in deciding on a generally applicable rule of law. Here, the FDIC has alleged that

> Weichern and Reed, contrary to the interests of FirstSouth and in order to preserve the attractive compensation arrangements and other benefits which they received from FirstSouth, caused FirstSouth to enter into certain high-risk, speculative, unsafe, and imprudent transactions ... and did not make full, true, and complete reports to other members of FirstSouth's Board of Directors with respect to such matters.

Comp. at ¶ 3. The Complaint does not provide a more detailed account of who did what, and why, or of who benefitted. FirstSouth's officers could have been acting to enrich the thrift's stockholders as well as themselves; additionally, they could have inadvertently

---

12. "Those objectives," *Cenco* states, "are to compensate the victims of wrongdoing and to deter future wrongdoing." *Cenco,* 686 F.2d at 455.

13. The parties have convincingly demonstrated their awareness of these decisions. There is no need to list or to discuss them here.

benefitted other stockholders, even if their intentions were purely selfish.

■■■■ If the only facts supporting an adverse interest argument are that FirstSouth ultimately failed, and that controlling officers engaging in wrongful conduct continued to draw their salaries, the plaintiff's position will be a difficult one to maintain. If, however, the officers were the only ones to ever benefit from their conduct, and if their preservation of "compensation arrangements" amounts to something comparable to looting or stealing from FirstSouth, then the adverse interest exception is likely to apply. The Court's intention here is only to explain how a better understanding of the facts (in addition to a more careful review of the law) will be necessary to define and to apply a rule governing the question of whether the knowledge of certain officers will be imputed to FirstSouth.

As the Court has already stated, the imputation issue is one that involves principles of corporations law and agency. The question of whether the FDIC can avoid accountability for knowledge imputed to FirstSouth—which the Court addresses below—is distinct from the one the Court has been discussing. Knowledge will not be imputed to the FDIC. Mr. Weichern and Mr. Reed did not work for the FDIC, and FirstSouth was not a subsidiary of the U.S. government or any government agency. If the FDIC constructively acquires knowledge held by FirstSouth officers, it will be because of a rule which requires the FDIC to "stand in the shoes" of the financial institution whose rights, powers, and privileges (including legal claims) it has received. Principles of imputation will determine what, if anything, FirstSouth's officers have left in the thrift's shoes. Principles of receivership will determine whether the FDIC has to stand in those shoes while it brings this lawsuit.[14]

More facts will also be necessary to determine whether particular officers (or other agents) of FirstSouth had sufficient control over the thrift's activities to justify imputation of their knowledge to the corporation.

At this point, there is no way to tell who did what, under what authority, even with respect to the examples of wrongdoing that the Complaint describes. In one recent case brought by the FDIC against the professional advisors of two failed S & Ls, a district court determined that knowledge held by employees with "significant control" over relevant transactions should be imputed to the corporations. *See FDIC v. Shrader & York,* 777 F.Supp. 533, 535 (S.D.Tex.1991). In *Ernst & Young,* the Fifth Circuit reasoned that "the level of [corporate] responsibility [for its agents' knowledge] must extend at least to the sole owner who dominated the board of directors." *Ernst & Young,* 967 F.2d at 171. Similar circumstances allowed the *Cenco* court to avoid a difficult line-drawing task; because the facts showed that fraud was "permeating the top management of Cenco," there was no need to address the hypothetical problem of knowledge possessed by a "lower down employee." Courts properly avoid creating tests that will not need to be applied to the facts of the cases before them. This case may require the Court to determine precisely how far down corporate responsibility for an agent's knowledge extends, or it may allow the Court to reach an easier conclusion that responsibility must extend at least to (or not as far as) a certain level of authority and control. Further discussion of this issue at this point would be premature.

**B.** *Defenses to Which the FDIC, as Receiver for FirstSouth, as Plaintiff, Will be Subject*

One thing the Court can determine here is the status of the FDIC as FirstSouth's receiver, at least with respect to defenses based on proximate cause and comparative fault.

■■■■ The FDIC has argued that Deloitte should not be permitted to argue that First-South's own actions were the sole proximate cause, or at least the primary cause, of its losses. The Court disagrees. First, it would be a dramatic departure from the most fun-

---

**14.** The Court is not entirely comfortable with the notion of a bank having shoes. Fictional personality is a necessary legal concept. Fictional foot-

wear, however, is a troubling self-inflicted metaphor to which the Court will only resort when precedent so requires.

damental principles of tort law to prohibit Deloitte from arguing that its actions were not a proximate cause of FirstSouth's losses. Proximate cause is an element of the plaintiff's case, and assuming this case goes to trial, the FDIC will have to prove it by a preponderance of the evidence. The FDIC has stated, "Regardless of the conduct of FirstSouth's officers and directors, Defendants are responsible for the consequences of their audit shortcomings." Opp. at 7. But in the Court's view, Deloitte is certainly entitled to argue that because of "the conduct of FirstSouth's officers and directors," its alleged "audit shortcomings" had no "consequences" at all. (That, essentially, was the Fifth Circuit's conclusion in affirming the grant of summary judgment against the FDIC in *Ernst & Young, supra.*)

■ Comparative fault is an affirmative defense and not an element of the plaintiff's case. Deloitte has urged the Court to conclude, as a matter of law, that FirstSouth (and thus the FDIC) was at least as much at fault for the thrift's losses as its accountants, and that therefore the plaintiff may not recover under Arkansas' comparative fault law. The Court cannot think of a more inappropri-

ate argument to make in the context of a 12(b)(6) motion. Whether it is ever proper to engage in a comparative fault analysis at this stage of a case—which is doubtful—the Court will not do so here.[15]

Whether expressed as a proximate cause argument or a comparative fault argument, Deloitte's position is that FirstSouth is responsible for its own losses. The FDIC's position is that the conduct of FirstSouth or its managers cannot form the basis of any defense to the claim it has brought in this suit. As the Court has already stated, the standard governing Rule 12(b)(6) motions will not permit it to reach the merits of Deloitte's proximate cause or comparative fault arguments.

■ The FDIC is correct to point out that it is not subject to every defense that might have been brought against FirstSouth. For example, under *D'Oench, Duhme & Co., Inc. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942) and a related line of cases, a defendant borrower being sued by the FDIC for defaulting on a debt may not assert an affirmative defense based on undocumented, oral side agreements or fraud.[16] The

**15.** The case that Deloitte cites in support of its argument "that FirstSouth's (FDIC's) recovery is barred by FirstSouth's own comparative fault, *as a matter of law,*" Mem.Rep. at 9 (emphasis in original), is *Chicago, Rock Island & Pacific Railroad Co. v. Kinard,* 299 F.2d 829 (8th Cir.1962). In *Chicago, Rock Island,* the court of appeals vacated a jury verdict in favor of a plaintiff who had driven his car into a train that was moving through a crossing. The court's conclusion did follow from its determination that "the plaintiff's contributory negligence here was established as a matter of law; and further, that as a matter of law such negligence was at least equal to if not greater than the negligence of the part of the defendant." *Id.* at 835. The *Chicago, Rock Island* court, however, was "forced to" that curious conclusion by a unique and unfortunate line of Arkansas cases that specifically dealt with accidents occurring at railroad crossings that were occupied by trains. It is probably not necessary, but the Court cautions the parties not to rely on these "occupied crossing" cases for more general rules of law. *Chicago, Rock Island* and the decisions it discusses are part of a sad and senseless legal legacy that protects railroads from tort liability at the expense of innocent victims. They achieve that by preemptively defining what constitute's a motorist's fault or contributing fault, when the facts of the cases would not support such a determination absent the im-

position of a special revisionist legal rule. Arkansas is not the only state to suffer from this type of case law. *See, e.g., Missouri Pac. R.R. Co. v. Cooper,* 563 S.W.2d 233, 235 (Tex.1978); *Sargent v. Southern Pac. Transp. Co.,* 264 Or. 435, 504 P.2d 729, 732 (1972); *Chaney v. Wabash R. Co.,* 422 S.W.2d 349, 352 (Mo.1967). In fact, it has succeeded in moving away from a strict occupied crossing rule, while not every state has. Judge Moore recently described Oklahoma's stubborn and harsh rule as "a legal dinosaur, which, once out, tramples twentieth century negligence law and then lumbers back to its cave only to await another victim." *Hurst v. Union Pacific Railroad Co.,* 958 F.2d 1002, 1003 (10th Cir.1992) (Moore, J.). Thankfully, Arkansas' current law is less primitive than Oklahoma's. *Chicago, Rock Island* even shows signs of that development. All this is to say that in the Court's view, Deloitte's reliance on dated occupied crossing cases is happily and entirely misplaced. The dinosaur may not be extinct, but it is certainly irrelevant enough to pose no threat here.

**16.** Other examples of the FDIC's ability to avoid defenses that could be asserted against a failed bank for which it acts as receiver do exist, but *D'Oench* is the most significant among them, and the one the FDIC relies on most to distinguish itself from FirstSouth.

*D'Oench* doctrine is an exception, created by federal law, to the general rule that when the FDIC acts as the receiver for a failed financial institution, it "stands in the shoes" of that institution. *See Kelley v. First Westroads Bank,* 840 F.2d 554, 559 (8th Cir.1988) ("In short, the FDIC [as receiver] stands in the position of the insolvent bank.");[17] *FDIC v. Harrison,* 735 F.2d 408, 412 (11th Cir. 1984) ("It has been held that when FDIC acts as a receiver and liquidating agent for a failed bank, as it did here, it merely 'stands in the shoes of the insolvent bank.'"). In deciding *D'Oench,* the Supreme Court fashioned a rule that would promote the federal policy, which had been expressed by statute (section 12B of the Federal Reserve Act, 12 U.S.C. § 264), "to protect [the FDIC], and the public funds it administers, against misrepresentations as to the securities or other assets in the portfolios of the banks which [it] insures or to which it makes loans." *D'Oench,* 315 U.S. at 456–57, 62 S.Ct. at 678–79.

The Court could create a *D'Oench*-type exception under federal law that would protect the FDIC from defenses based upon the conduct of a thrift's officers when the FDIC brings suit as the thrift's receiver. However, the Court has decided that, absent statutory guidance such as that the Supreme Court relied upon in *D'Oench,* it should not adopt a rule that would necessarily represent a more far-reaching departure from the general rules of receivership than *D'Oench* and its doctrine have ever achieved. Instead, the

Court is persuaded by the reasoning in *Ernst & Young* and *FDIC v. Cherry, Bekaert & Holland,* 742 F.Supp. 612 (M.D.Fla.). In those cases, like this one, the FDIC brought suit against accounting firms for professional negligence in auditing financial institutions that had gone into receivership. The district court in *Cherry, Bekaert*—relying on an Eleventh Circuit decision[18] for the proposition that "the special protections afforded the FDIC by *D'Oench* and its progeny are limited in scope"—refused to extend *D'Oench* to cases involving "defendants other than borrowers and defenses much different than those considered by the *D'Oench* progeny courts." *Id.,* 742 F.Supp. at 615. The court therefore concluded that the defendant accounting firm was entitled to assert a defense of "comparative and/or contributory negligence" against the FDIC in a professional negligence case. *Id.* at 613.[19]

In *Ernst & Young,* the Fifth Circuit cited *Cherry, Bekaert* in reaching a similar conclusion. The defendant accounting firm in *Ernst & Young,* as the Court has noted, won summary judgment because according to the court of appeals, the undisputed facts of the case showed that the accountants' alleged negligence in auditing a thrift that later failed could not have proximately caused the thrift's losses. *Ernst & Young,* 967 F.2d at 170–72. The court stated: "We affirm the district court's holding that the FDIC is not entitled to special protection when it brings a

---

17. The Eighth Circuit invoked this rule in *Kelley* to support its conclusion that the FDIC had the "rights, powers, and privileges" of an insolvent bank. The case does not deal with defenses that may be brought against the FDIC acting as a receiver, but the rule it cites is stated in general terms and does not allow the FDIC to avoid the ordinary limitations that encumber a bank's legal rights and limit its powers and privileges. Unless an exception like the one crafted in *D'Oench* applies, the creation of a receivership only transfers the legal claims that belong to a failed institution, and those claims are not freed of defenses to them by virtue of being acquired by the FDIC.

18. *FDIC v. Harrison,* 735 F.2d 408 (11th Cir. 1984).

19. In *Cherry, Bekaert,* the FDIC was suing in its corporate capacity because the FDIC, as the failed bank's receiver, had assigned the bank to

the FDIC's corporate form. In the Court's view, that fact does not distinguish the case. The FDIC in its corporate capacity could only have acquired the bank's claims, together with the associated defenses to those claims, from the FDIC as receiver, which acquired them from the bank because it could not avail itself of the limited protection afforded by the *D'Oench* doctrine.

*Cherry, Bekaert* also held that the defendant accounting firm was entitled to assert an affirmative defense based on the FDIC's failure to mitigate damages after it had taken over as the bank's receiver. *Id.* at 613–614. That issue has been raised in this case in relation to a discovery dispute. As the Court has stated in an earlier order, that question can be addressed when and if Deloitte attempts to raise a mitigation defense.

tort claim against a third party on behalf of a defunct financial entity." *Id.* at 170.[20]

In light of the magnitude of the thrift crisis and the responsibilities that have been placed upon the FDIC, Congress might act to create the kind of special protection that *Ernst & Young* denied the FDIC in cases where professional advisors have been negligent in performing services for federally insured financial institutions. Until it does, however—or at least until it enacts legislation expressing a federal policy that would be promoted by giving the FDIC the protection it asks for here—the Court believes that the correct approach is the one taken in *Cherry, Bekaert* and *Ernst & Young*. Therefore, Deloitte will be permitted to assert proximate cause and comparative fault defenses based upon the conduct and knowledge of FirstSouth.[21]

## C. The Kind of Fault Accountants Can Compare to Their Own When Sued for Professional Negligence Under Arkansas Law

The Court has decided that Deloitte is entitled to assert a comparative fault defense

---

**20.** The Fifth Circuit went on to state: "No statutory justification or public policy exists to treat the FDIC differently from other assignees when the FDIC as a matter of choice in this case has limited its claim to that of an assignee." *Id.* As the Court explained above, Arkansas law has done to the FDIC in this case what the FDIC did to itself in *Ernst & Young*. That difference does not create a statutory justification or a public policy where none was found to exist in *Ernst & Young*. Rules of assignment, like the *Ultramares* rule limiting accountants liability for negligence, are products of state law. Federal courts could create an exception to those rules in cases like these, but they have not been lead by statute or policy to do so.

**21.** In *FDIC v. O'Melveny & Meyers*, 969 F.2d 744 (9th Cir.1992), the FDIC sued a law firm for its negligence in performing professional services for a failed bank. On appeal from the district court's grant of summary judgment in favor of O'Melveny, the law firm argued that the misconduct of the bank's controlling managers was attributable to the bank, and that the FDIC, as its receiver, must stand in the bank's shoes. "Under this argument, FDIC would be estopped from making a claim against O'Melveny by the wrongdoing of the corporate insiders." *Id.* at 749.

The Court of Appeals for the Ninth Circuit reversed the district court's decision and held that O'Melveny was not entitled to assert an equitable estoppel defense against the FDIC. *Id.* at 752. The Ninth Circuit stated:

[W]e conclude that the equities between a party asserting an equitable defense and a bank are at such variance with the equities between the party and a receiver of the bank that equitable defenses good against the bank should not be available against the receiver. To hold otherwise would be to elevate form over substance—something courts sitting in equity traditionally will not do. Of course, it does not necessarily follow that equitable defenses can never be asserted against FDIC acting as a receiver; we hold only that the bank's inequitable conduct is not imputed to FDIC.

*Id.* O'Melveny is similar to this case in several respects and different in others. The tone of the opinion, and its general attitude toward suits the

FDIC brings against the professional advisors of a failed bank formerly managed by miscreant insiders, certainly supports the FDIC's position here. After summarizing O'Melveny's estoppel argument, the court states, "We disagree with this flat statement of the law, particularly in view of the public expectation that the wrongdoing will be exposed, the wrongdoers pursued, and the innocent victims of fraud will have a chance at recovering." *Id.* at 749. That sentiment, read broadly, could be enlisted to challenge this Court's decision here to allow Deloitte to assert defenses based on comparative fault or even proximate cause. (The fact that wrongdoing does not proximately cause injury does not make it less wrong, only less actionable.)

*O'Melveny*, however, is a decision about equitable estoppel. Its tone reflects the Ninth Circuit's assessment of the parties' ethical positions. The FDIC had done nothing wrong, whereas the law firm had (at least allegedly) breached fundamental professional duties. Those are appropriate concerns for a court "sitting in equity." In this case, however, Deloitte has not attempted to assert an equitable defense. Until it does, the *O'Melveny* decision is related, but not directly relevant, to the disposition of the issues that have been raised here.

The Court does not mean to suggest that it will follow *O'Melveny* if and when Deloitte asserts an equitable defense. Other courts have taken a different view of the issue. *See FDIC v. Harrison*, 735 F.2d 408, 412–13 (11th Cir.1984). These comments are only intended to express the Court's view that the issues addressed in this order are different from the one resolved in *O'Melveny*. The question of whether Deloitte may raise a defense of equitable estoppel against the FDIC in this case should not be answered before it is asked. (At one point, Deloitte has stated that the plaintiff is "estopped from shifting the costs of its own wrongdoing to Deloitte." Mem.Rep. at 16–17. This is a casual comment however, and the Court—like Deloitte, assuredly—does not view it as asserting an estoppel defense. The parties have not been subtle or brief in expressing their positions. If the defendant meant to make an estoppel argument, the Court would know about it.)

against the FDIC. A question remains, however, as to the type of comparative fault defense Deloitte will be able to make. In some states, accountants sued for negligently failing to discover wrongdoing by a client's employee may only assert a limited defense based on the client's relative fault for the harm suffered. In those states, a client's negligence may only provide support for an accountant's defense to the extent the client's negligence contributed to the accountant's failure to perform its duties and report the truth. The first case to adopt this rule was *National Surety Corp. v. Lybrand,* 256 A.D. 226, 236, 9 N.Y.S.2d 554, 563 (1939).[22] The most frequently cited recent case adopting the *National Surety* rule is *Lincoln Grain, Inc. v. Coopers & Lybrand,* 216 Neb. 433, 345 N.W.2d 300 (1984). (*Lincoln Grain* is popular enough to displace *National Surety,* at least on occasion, as the case that gives the rule its name.) Other cases following *National Surety* include *Fullmer v. Wohlfeiler & Beck,* 905 F.2d 1394 (10th Cir.1990) (decided under Utah law); *Hall & Co. Inc., v. Steiner & Mondore,* 147 A.D.2d 225, 228, 543 N.Y.S.2d 190, 191–92 (1989); *JewelCor Jewelers & Distrib., Inc. v. Corr,* 542 A.2d 72, 80 (1988), *appeal denied,* 524 Pa. 608, 569 A.2d 1367 (1989); *Greenstein, Logan & Co. v. Burgess Marketing, Inc.,* 744 S.W.2d 170, 190 (Tex.App.1987); *Shapiro v. Glekel,* 380 F.Supp. 1053, 1058 (S.D.N.Y.1974); *Cereal Byproducts Co. v. Hall,* 8 Ill.App.2d 331, 132 N.E.2d 27, 29–30 (1956), *aff'd,* 15 Ill.2d 313, 155 N.E.2d 14 (1958). The two commentators who have considered the question also prefer the *National Surety* rule to one allow-

ing accountants to assert an unrestricted defense based on a client's negligence. *See* Menzel, *The Defense of Contributory Negligence in an Accountant's Malpractice Action,* 13 Seton Hall L.Rev. 292 (1983); Hawkins, *Professional Negligence Liability of Public Accountants,* 12 Vand.L.Rev. 797 (1959). The FDIC has urged the Court to follow *National Surety* in ruling on Deloitte's motion to dismiss.[23]

■■ The *National Surety* rule does not bar the assertion of a contributory negligence[24] defense but merely limits its scope. States following *National Surety* allow accountants to blame their clients, but only for conduct that contributes to the accountants' mistakes, as opposed to conduct that may have directly caused the clients' losses. Such a rule might not make a significant difference in the outcome of this case. The Complaint faults Deloitte for, among other things, negligently relying on financial statements provided by FirstSouth. Instances of FirstSouth's misconduct,[25] therefore—for example, its disclosure of false descriptions of its activities and financial status—could very well have contributed to DH & S's negligence. The Complaint does not describe a purely passive client who could only be faulted for failing to make more diligent, aggressive efforts to discover employee misconduct. (That is the situation described in *National Surety* and most of the cases following it.) Of course, further development of the facts must occur before the Court reaches any conclusion with respect to the question of whether FirstSouth's wrongdoing contributed to Deloitte's

---

**22.** The first case to seriously consider the rule was *Craig v. Anyon,* 212 A.D. 55, 208 N.Y.S. 259, *affirmed,* 242 N.Y. 569, 152 N.E. 431 (1926). *Craig,* however, allowed the defendant-accountant to prevail because the plaintiff-client "had been negligent in failing properly to supervise [its employee's] acts or to learn the true condition of their own business and to detect his wrongdoing." 208 N.Y.S. at 269. *National Surety* adopted the position advanced by the dissenting justice in *Craig.*

**23.** This is another issue that the Court need not address at this stage of the case. The parties have requested it to do so, however, and the Court has agreed. Again, the hope is that an early resolution of purely legal questions that have been briefed and that the facts of the case

clearly present might help to focus the case and assist the parties in conducting discovery.

**24.** For the moment, the Court is using the term "contributory negligence" to include any defense based on plaintiff's fault for harm caused. The distinction between the concepts of contributory negligence and comparative fault is important; it will be discussed below, where it matters.

**25.** It should be clear that in referring to the parties' misconduct or negligence, the Court is merely making assumptions based on allegations. Nothing has been proven. References to FirstSouth's actions also imply an assumption about imputation. The Court has not decided that any activity will be imputed to FirstSouth, and it does not mean to suggest otherwise.

wrongdoing. At this point, however, it appears that a decision to adopt the *National Surety* rule would not leave Deloitte without a defense based on its client's responsibility for the harm the thrift suffered.[26]

■ *National Surety* has not won universal acceptance. The Supreme Court of Minnesota, for example, has recently declined to follow it. *See Halla Nursery v. Baumann–Furrie & Co.*, 454 N.W.2d 905 (Minn.1990). The parties have not cited an Arkansas decision addressing the scope of a contributory fault defense in an accountants malpractice case, and the Court is not aware of one.[27] Therefore, the Court confronts the task of predicting how the highest court of this State would resolve the question. *See Gearhart v. Uniden Corp. of America*, 781 F.2d 147, 149 (8th Cir.1986). It has concluded that the Arkansas Supreme Court would be persuaded by the Minnesota Supreme Court's decision in *Halla Nursery*, and would therefore permit an accountant sued for professional negligence to assert a traditional, unrestricted comparative fault defense based upon its client's wrongdoing.

In *National Surety*, the defendant accountants, who had been hired to audit the plaintiff stockbroker company, failed to discover that a cashier had been embezzling funds from the brokerage. In support of its decision to reject the accountants' defense that the plaintiff had been contributorily negligent in running its business, the Court explained: "We are ... not prepared to admit that accountants are immune from the consequences of their negligence because those who employ them have conducted their own business negligently." *National Surety*, 9 N.Y.S.2d at 563. Courts following *National Surety* (and commentators recommending its rule) have expressed a similar view; without such a rule, they reason, accountants would achieve complete immunity from liability for negligently failing to do a job their clients properly rely on them to do. The U.S. Court of Appeals for the Tenth Circuit, for example, upon carefully considering the question, recently concluded that Utah law would adopt the *National Surety* approach because "the more fundamental principle is that the accountant should not be absolved of the duty undertaken by him to one reasonably relying on his audit unless the plaintiff's negligence contributed to the auditor's misstatement in his reports." *Fullmer*, 905 F.2d at 1399.

■ The Court does not believe that a failure to follow *National Surety* would "absolve" accountants of their duties or provide them with immunity from liability for their negligence—at least not under a comparative fault scheme such as Arkansas'. The New York Court deciding *National Surety* was understandably concerned about the consequences of the approach that had been taken in *Craig v. Anyon, supra*, which it rejected. Under the traditional doctrine of contributory negligence in place at that time, any negligence on the part of the plaintiff established a complete bar to recovery. And in cases of

26. Deloitte argues that *"National Surety* and its progeny have little bearing on FirstSouth's claim" because here, a comparative fault defense will be based on intentional as opposed to negligent client conduct. *See* Mem.Rep. at 7. The Court disagrees. *National Surety* and cases following it spoke in terms of contributory negligence because that was the defense the defendant accountants were attempting to raise. When Deloitte asserts a relative fault type of defense, it will do so under the Arkansas comparative fault statute, *see* Ark.Stat.Ann. § 16–64–122 (1987), which defines "fault" as "any act, omission, conduct, risk assumed, breach of warranty, or breach of any legal duty which is a proximate cause of any damages sustained by any party." The statute calls for a comparison of fault, not just negligence, and fault encompasses intentional conduct. If FirstSouth committed intentional misconduct that contributed to DH & S' negligence, then under a *National Surety* approach,

Deloitte could use that fact as the basis of a defense. It would make *National Surety* less significant, and less damaging to Deloitte, but it would not make the rule irrelevant.

As an additional note, the Court would prefer Deloitte not to use "FirstSouth" interchangeably with "the FDIC." This is the FDIC's claim, not FirstSouth's. The Court understands Deloitte's position that as a legal matter, the FDIC and FirstSouth are, in fact, interchangeable. That argument, however, should not be made semantically, even in contexts where the Court accepts it.

27. *Robertson*, 633 F.Supp. at 971–72, does show an awareness of this question, and it cites *Lincoln Grain.* It does not, however, pause to consider, let alone conclusively determine, whether the rule would apply under Arkansas law.

undetected wrongdoing by an employee, it would not be unrealistic to assume that some carelessness (or imputed wrongdoing) on the part of the employer could always be shown. However, Deloitte points out that Arkansas, like Minnesota, has adopted a broad doctrine of comparative fault, and that therefore, the Minnesota Supreme Court's decision in *Halla Nursery* provides the most appropriate guidance for a decision here.[28] Other state courts (in addition to the Minnesota Court) have recently accepted and advanced this argument. *See Devco Premium Finance Co. v. North River Ins. Co.*, 450 So.2d 1216, 1220 (Fla.Dist.Ct.App.1984); *Capital Mortgage Corp. v. Coopers & Lybrand*, 142 Mich.App. 531, 369 N.W.2d 922, 925 (1985).[29] These decisions reason that without the harsh consequences of a contributory negligence rule, a *National Surety*–type exception to the broadly applicable principle of comparative fault is not necessary or desirable. The Court agrees and feels that Arkansas would as well.[30] Accountants are capable of harmful negligence, as are their clients. The Arkansas comparative fault law is capable of recognizing and distributing fault between parties whose misconduct contributed to an actionable loss. As the State Supreme Court has stated, "The purpose of our comparative negligence statute is to distribute the total damages among those who caused them."

*Stull v. Ragsdale*, 273 Ark. 277, 620 S.W.2d 264, 267 (1981). The Court believes that the law can achieve its purpose in accountants malpractice actions, and that its application will not improperly protect accountants from liability for the portion of harm caused by their professional negligence.

The Court agrees with the Minnesota Supreme Court's comments in *Halla Nursery* that

> [a]ccountants, like other professionals, are held to a standard of care which requires that they exercise the average ability and skill of those engaged in that profession. Failure to exercise ordinary care in conducting accounting activities may expose an accountant to allegations of negligence. By the same token, the persons who hire accountants, usually businesspersons, should also be required to conduct their business activities in a reasonable and prudent manner.

454 N.W.2d at 909 (quotations and citations omitted). The Court concludes that the highest court of this State would follow the traditional Arkansas rule of comparative fault in accountants malpractice cases, because such a rule would appreciate and work to enforce the respective duties of accountants and their clients. Neither party to

---

**28.** Minnesota and Arkansas have adopted similar but not identical comparative fault rules. The difference is that under the Minnesota statute, a person may recover when "the contributory fault was *not greater than* the fault of the person against whom the recovery is sought," Minn.Stat. Ann. § 604.01 (1988) (emphasis added), while under the Arkansas statute, a party claiming damages may recover when" the fault chargeable to [that party] is *of a lesser degree* than the fault chargeable to the party or parties from whom the claiming person seeks to recover damages." Ark.Stat.Ann. 16–64–122 (1987). Thus, under Minnesota law, when the claiming party is equally at fault, it may still recover. Under Arkansas law, it may not. (The Minnesota rule is an example of what is sometimes called "The New Hampshire Plan.")

The Arkansas comparative fault rule was, for a brief time, considerably more expansive than it is now. The State was one of the earliest to adopt comparative negligence when it first did so in 1954. The original statute followed the Mississippi model and Dean Prosser's forceful recommendation; thus, "the Prosser Act," as it was called, adopted the "pure" form of comparative

negligence. The law was immediately and universally unpopular. Consequently, the Arkansas legislature abandoned it in 1957, adopting instead a "modified" form of comparative negligence like the one in force today. For a good overview of the history and development of comparative fault in Arkansas and other jurisdictions, see H. Woods, *Comparative Fault* (2d ed. 1987), 17–30.

**29.** Florida and Michigan, unlike Minnesota and Arkansas, are pure comparative negligence states.

**30.** *Fullmer, supra,* considers and flatly rejects this position, and it accurately points out that while *Lincoln Grain* spoke in terms of contributory negligence, "in actuality the case was decided in the context of comparative negligence principles." 905 F.2d at 1398. *Fullmer* is also correct that the Menzel article, *supra,* concludes that *National Surety* provides the better rule, regardless of whether a jurisdiction uses contributory or comparative negligence. The Court acknowledges this adverse authority, but does not agree with it.

these disputes deserves or requires exceptional protection or exceptional exposure to suit. A comparative fault approach, unrestricted by the *National Surety* rule, is capable of an even-handed apportionment of liability for harm in this type of case.[31]

## V.

Lastly, the Court takes up the statute of limitations issue. Deloitte argues that under the applicable statute of limitations, any part of the FDIC's claim based on DH & S's performance of the audit for fiscal 1983 is time barred. Under Arkansas law, the limitations period for professional negligence is three years, and it begins to run at the time the tortious conduct is committed. *See* Ark. Stat.Ann. § 16–56–105 (1987). DH & S completed the 1983 audit by early September of 1983. FirstSouth went into receivership on December 4, 1986. Therefore, Deloitte

points out, the limitations period of three years had already run when FSLIC was appointed the sole receiver of FirstSouth, and the receiver is not entitled to assert claims that were already barred by the state statute of limitations when the receiver acquired them. *See* Mem. at 22.

The FDIC does not argue that Deloitte has misidentified the applicable statute of limitations; nor does the FDIC argue that it is entitled to bring this suit even if the limitations period had run by the time First-South went into receivership. It contends, however, that the statute was tolled—or at least could have been, depending on the resolution of factual questions—for two reasons: (1) the continuous treatment doctrine, and (2) fraudulent concealment.

The Court has determined that the allegations now contained in the Amended Com-

---

31. The Minnesota Court relied, in part, on decisions in that State that had allowed comparative negligence defenses in medical malpractice cases. *Halla Nursery,* 454 N.W.2d at 909. A similar argument could be made here. While the Court is not aware of an Arkansas decision allowing a doctor sued for malpractice to raise a comparative fault defense based on a patient's wrongdoing, the State Supreme Court, prior to the enactment of Arkansas' comparative fault statute, held that it was proper to give a contributory negligence instruction in a medical malpractice case. *See Dunman v. Raney,* 118 Ark. 337, 347–48, 176 S.W. 339 (1915). If a contributory negligence defense was available to doctors under Arkansas law, then the Court has no reason to suspect that a less drastic comparative fault defense would not be as well. This is not a controversial issue: "[I]t has been uniformly held that, where negligence on the part of the patient or those acting for him proximately conduced or contributed to the injury complained of, the patient's recovery may be barred or diminished by the amount of negligence attributable to the plaintiff." 70 C.J.S. Physicians & Surgeons § 80 (1987 & Supp.1992) (citations omitted). But in the Court's view, the uniformity with which states have allowed such a defense provides a telling indication that the comparison between patient's fault in medical malpractice cases and client's fault in accountants malpractice cases is not particularly useful. In Nebraska, for example, the state that gave us *Lincoln Grain,* "it is settled ... that contributory negligence is a valid defense in a medical malpractice case." *Skar v. City of Lincoln,* 599 F.2d 253, 260 (8th Cir.1979) (citing Nebraska authority). Courts following *National Surety* have done so because of their perception that a special problem exists in professional negligence actions

brought against accountants who fail to discover wrongdoing by a client's employee. Given that perception, and the rationale it has produced, malpractice cases involving other professions do not seem to provide meaningful support for a decision to reject *National Surety.*

Support for the Court's decision to follow the *Halla Nursery* approach is available, outside the context of professional malpractice, if one is willing to reach for it. One credible example, in the Court's view, is the *Ultramares* rule and the Arkansas statute on accountants liability that has superseded it, *supra.* This is clearly not an argument about controlling authority. The project of predicting how the highest court of a state will address an unaddressed question, however, often requires reliance on loosely analogous legal issues. Prediction, after all, would not be necessary if state law provided a readily ascertainable answer. The Court offers *Robertson*'s adoption of *Ultramares* and Ark.Stat.Ann. § 16–114–302 (1987 & Cum.Supp.1991) as an obliquely relevant analogy, and merely observes that when Arkansas law has maintained special rules governing accountants' liability for negligence, it has opted to protect that profession rather than to place additional burdens on it.

As a final note, the Court's decision to forsake *National Surety* does not foreclose the possibility that exceptions may exist to a general rule that accountants may raise an unrestricted defense of comparative fault when sued for professional negligence. (*Halla Nursery* makes this point as well. *See* 454 N.W.2d at 909.) In fact, the facts of this case, when they have been developed, may warrant the application of such an exception. At this point, however, a statement of the general rule under Arkansas law is as much as the Court can provide.

plaint are insufficient to support either of the FDIC's tolling theories, and that therefore the part of the plaintiff's claim based on the 1983 audit cannot survive a motion to dismiss.

## A. Pleading Requirements

Deloitte faults the FDIC for first raising its continuous treatment and fraudulent concealment arguments in response to the motion to dismiss. This criticism is somewhat overstated.

A statute of limitations provides an affirmative defense that might be either asserted or waived. As a general rule, plaintiffs have no duty to anticipate affirmative defenses; thus, they are not ordinarily required to plead avoidance of a limitations bar.[32] A limitations defense, however, may be asserted in a motion to dismiss. "When it 'appears from the face of the complaint itself that the limitation period has run,' a limitations defense may properly be asserted through a 12(b)(6) motion to dismiss." *Wycoff v. Menke*, 773 F.2d 983, 984–85 (8th Cir.1985) (quoting *R.W. Murray Co. v. Shatterproof Glass Corp.*, 697 F.2d 818, 821 (8th Cir.1983)), *cert. denied*, 475 U.S. 1028, 106 S.Ct. 1230, 89 L.Ed.2d 339. So, while the FDIC did not need to anticipate Deloitte's assertion of a limitations defense by formally and expressly pleading a tolling doctrine, its Complaint does need to allege facts adequate to support the application of a doctrine on which it would rely should such a defense be raised at this stage. Because the defense has been raised, the Court will consider what "appears from the face of the complaint," keeping in mind the standard governing Rule 12(b)(6) motions.[33] The question these principles require the Court to consider, then, is whether the FDIC's Complaint contains allegations which, if true, show the merit of one

of its arguments as to why the statute of limitations should be tolled in this case.

## B. Continuous Treatment

The continuous treatment doctrine originated in the context of medical malpractice actions. It operates to toll a statute of limitations during the time that a patient is receiving continuous treatment for a given illness or injury. Here, the FDIC argues that DH & S's 1983 audit was part of a continuous course of accounting treatment that the firm provided to FirstSouth through 1986.

Of the many states that apply the continuous treatment doctrine in medical malpractice cases, only two (New York and Virginia) have extended it to the context of accountants malpractice.[34] Arkansas has not, nor has it refused to do so. The Court need not determine whether Arkansas would apply the continuous treatment doctrine to accountants malpractice cases, however, because the FDIC has not alleged sufficient facts to show continuous treatment, as the doctrine defines it, in this case.

New York invented the continuous treatment doctrine in *Borgia v. New York*, 12 N.Y.2d 151, 237 N.Y.S.2d 319, 187 N.E.2d 777 (1962), and that decision contains the most frequently quoted statement of the doctrine's scope. *Borgia* states:

> [W]hen the course of treatment which includes the wrongful acts or omissions has run continuously and is related to the same original condition or complaint, the "accrual" comes only at the end of the treatment.... The "continuous treatment" we mean, however, is treatment for the same or related illnesses or injuries, continuing after the alleged acts of malpractice, not

---

**32.** Some statutes create exceptions to this rule and require plaintiffs to plead timeliness as an element of their prima facie case. This court, however, has demonstrated a willingness to look past such technical requirements and to consider whether a complaint contains allegations that would support a tolling argument. *See LeCroy v. Dean Witter*, 585 F.Supp. 753, 757 (E.D.Ark. 1984).

**33.** Arkansas law requires the same approach. *See, e.g., Jones v. Central Arkansas Radiation Therapy Institute, Inc.*, 270 Ark. 988, 607 S.W.2d 334 (1980) (Arkansas Supreme Court determining that complaint contained sufficient facts to support possibility of fraudulent concealment).

**34.** In addition to the New York cases the plaintiff cites and the Court discusses below, see *Boone v. C. Arthur Weaver Co., Inc.*, 235 Va. 157, 365 S.E.2d 764, 766–67 (1988).

mere continuity of a general physician-patient relationship.

*Id.* at 779. The Complaint does not allege facts showing that the "treatment" DH & S provided to FirstSouth was for the same or related problems. Instead, the Complaint merely describes a general and ongoing accountant-client relationship. If the continuous treatment doctrine applied under the alleged facts of this case, it almost certainly would apply in every case involving an accountant that had performed audits for a client in consecutive years. That result is not acceptable, nor is it called for by the doctrine described in *Borgia* and adopted by the Arkansas Supreme Court in *Lane v. Lane*, 295 Ark. 671, 752 S.W.2d 25 (1988).

The FDIC points to three facts in support of its argument that DH & S provided FirstSouth with continuous treatment between 1983 and 1986. *See* Opp. at 27. First, it points out that "DH & S conducted annual audits from 1983 to 1986...." That fact cannot suffice to show anything more than a continuing client-accountant relationship. It provides no support for an argument that the treatment involved the same condition or problem. Again, the implications of an alternative conclusion are far too sweeping: no statute would begin to run against any professional who provided any regular services to an individual or entity over a period of time.

Second, the FDIC states that "FirstSouth officers consulted frequently with DH & S between audits, including seeking advice regarding how to structure transactions." *Id.* One paragraph of the Complaint is cited in support of that contention, which reads as follows:

From at least 1984 until late 1986, Lowery and FirstSouth's President and Chief Operating Officer consulted frequently with Posey and Haigh. Through Posey and Haigh, DH & S provided advice to FirstSouth on numerous matters, including how to structure transactions in order to achieve desired accounting treatment.

Comp. at ¶ 35. Tad Lowery worked for DH & S during the 1983 audit and then took a position with FirstSouth. William Posey and Michael Haigh worked for DH & S during the relevant time period and had significant roles in preparing the FirstSouth audits.

These allegations do not describe continuous treatment of the same problem. First, the Complaint states that the consultations and advice began in 1984. It does not make any effort to connect these events, temporally, to the 1983 audit; in fact, it does not even allege that meetings occurred prior to the completion of the 1984 audit.[35] Second, the Complaint makes no effort to connect the advice and consultations to the audits in a substantive way. It is silent as to the content of the advice the DH & S employees gave, and as to how that advice related to the work the accountants performed in auditing FirstSouth. Audits and accounting advice could be part of a continuing service that an accountant provides a client to address the same or related problems.[36] That is not, however, what the FDIC's Complaint alleges.

The third and last fact the FDIC cites in support of its continuous treatment argument is that "[t]he interrelationship between audits is also shown by the continuing problems with many of the same troubled loans." Opp. at 27. This is another argument that, if

---

**35.** "[T]he 'continuous treatment' must be treatment for the same or related condition ...; not mere continuity of a general professional relationship.... But 'relation' is not the only element which must be found in order for the doctrine to apply; *there must also be continuity* ...." *Tool v. Boutelle*, 91 Misc.2d 464, 398 N.Y.S.2d 128, 130 (Sup.Ct. Albany Co. 1977). According to *Tool*, "continuous" means "stretching on without break or interruption." *Id.* at 128. *See also, Lincoln Grain, Inc. v. Coopers & Lybrand*, 215 Neb. 289, 338 N.W.2d 594, 598 (relying on *Tool*, and also citing dictionary defi-

nition of "continuity": "being continuous ... state of continuing without essential change.")

**36.** Deloitte argues that annual audits are independent "as a matter of law." The Court does not reach that question here. It merely concludes that the FDIC has not pleaded facts showing continuous treatment, although such facts are imaginable. The Court notes, however, that cases such as *Investors Funding* and *Lincoln Grain, infra* n. 37, do not support Deloitte's position that a principle of law would prevent the Court from viewing annual audits as part of continuing treatment.

accepted, would toll statutes of limitations from the outset of almost any client-accountant relationship. Accountants auditing a business in consecutive fiscal years will, absent exceptional circumstances, encounter familiar transactions, assets, and liabilities. Unless a company completely reinvents itself between audits, the kind of fact the FDIC alleges here will always exist. If the continuous treatment doctrine, as *Borgia* cautioned, should not extend to the general professional-client relationship, the presence of transactions with a life span of more than one fiscal year cannot be enough to toll a statute of limitations.

An audit is to accounting what a comprehensive annual physical examination is to medical treatment. Viewing FirstSouth as the patient and DH & S as the doctor, this helpful analogy can be expanded to include the pleaded facts of this case. By recasting the relevant events as a medical malpractice case, one can more easily appreciate why the continuous treatment doctrine cannot apply here, even if Arkansas were to extend it beyond the context in which it originated. Consider, then, the following hypothetical set of facts. Between 1983 and 1986, a patient went to a doctor for thorough yearly check-ups. Each year, the doctor happily reported that the patient was in good physical condition. The patient, however, was actually suffering from an illness that the doctor carelessly overlooked from one year to the next.

Some of the symptoms of the illness were always present, while others appeared and receded. All, however, would have been discovered by a doctor whose conduct met the standard of professional care. Between check-ups, the doctor gave the patient some medical advice; at present, nobody knows anything about the content of the advice, when it was given, or whether it related to the check-ups in any way. After four years, the patient died of the illness. The patient's survivors now sue the doctor for malpractice, claiming that if the doctor had discovered and informed someone about the patient's true condition, something could have been done to treat or even to cure the patient. These facts would not call for the application of the continuous treatment doctrine. They do not describe a continuous course of treatment "for the same or related illnesses or injuries," but instead describe a "mere continuity of a general physician-patient relationship." *Borgia, supra.* The same must be said for the Complaint's description of the relationship between DH & S and FirstSouth.

Again, the Court is not saying that the performance of audits in consecutive fiscal years can never form part of a course of providing professional services that would call for the application of the continuous treatment doctrine (in a jurisdiction that extended it to accountants malpractice cases).[37]

---

**37.** Significantly, of the cases the FDIC cites to show that the continuous treatment doctrine has been applied in accountants malpractice cases, not one contains a decision to apply the doctrine in a case involving yearly audits. *See Wilkin v. Dana R. Pickup & Co.*, 74 Misc.2d 1025, 347 N.Y.S.2d 122, 124 (Sup.Ct. Allegheny Co. 1973) (discussing factors which may contribute to "continuity of tax representation"); *Cohen v. Goodfriend*, 642 F.Supp. 95, 101 (E.D.N.Y.1986) (defendant accountants (1) counseled the plaintiff to buy a partnership interest, (2) prepared false and misleading projections to induce the plaintiff to make the investment, (3) managed the partnership, (4) prepared the plaintiff's tax returns, and (5) continued making misrepresentations to the plaintiff after the alleged malpractice occurred); *In re Wedtech Corp.*, 81 B.R. 240, 242 (S.D.N.Y.1987) (accountants provided client with "cold comfort letters" over period of time); *Dymm v. Cahill*, 730 F.Supp. 1245, 1248–49, 1263 (S.D.N.Y.1990) (defendant "committed allegedly wrongful acts not in his capacity as an

accountant, but rather as plaintiff's investment advisor").

*In re Investors Funding Corp.*, 523 F.Supp. 533 (S.D.N.Y.1980) did involve annual audits. The court there declined to rule on the applicability of the continuous treatment doctrine because of the existence of "disputed factual issues, for example, as to the independence of each annual audit from prior annual audits." *Id.* at 548 (citing *Wilkin, supra* ). *Investors Funding* is not a case where the continuous treatment doctrine was *actually applied; it does* show, however, an unrealized possibility that it could apply in a case involving annual audits. The present case is different, in the Court's view, because the Complaint does not allege sufficient facts to create the kind of disputed factual issue that would need to be resolved before determining whether the audits represented part of a *continuous course of* treatment for the same or a related problem.

The FDIC does not cite *Lincoln Grain, Inc. v. Coopers & Lybrand*, 215 Neb. 289, 338 N.W.2d 594, 597–98 (1983). (This is *"Lincoln Grain I."* The *National Surety* rule was at issue in *"Lincoln*

Accepting the FDIC's argument, however, would mean that the performance of consecutive yearly audits would always constitute continuous treatment. The Court is not willing to accept that result, nor should it under a proper application of the continuous treatment doctrine.

Because the applicable limitations period has apparently run with respect to DH & S's preparation of the 1983 audit, the FDIC needs to have made allegations which, when accepted as true, show that the preparation of the 1983 audit was part of a continuing course of treatment for the same or a related problem. In deciding whether the FDIC has met this requirement, the Court must confine its focus to the face of the Complaint. It would be improper to consider what might have occurred here but what has not been pleaded. The mere possibility of continuous treatment, which can be imagined but which has not been alleged, is not enough; such a possibility, however, is all that appears on the face of the Complaint. The FDIC has failed to plead facts describing continuous treatment. Therefore, the Court cannot accept this argument for tolling the statute of limitations.

### C. *Fraudulent Concealment*

 The FDIC next argues that the statute of limitations was tolled by DH & S's fraudulent concealment.[38] It correctly points out that under Arkansas law, "concealment of the wrong" does operate to toll the statute of limitations in professional malpractice cases. *See Ford's, Inc. v. Russell Brown & Co.*, 299 Ark. 426, 773 S.W.2d 90, 92–93 (1989). The FDIC has also demonstrated that Arkansas courts have tolled statutes because of constructive fraud. See Opp. at 28–29 (citing cases).

 As the Court has stated, in order to survive a motion to dismiss based upon an apparently applicable limitations bar, a complaint must plead the facts required to show why the defense should not apply. This pleading standard is particularly difficult to meet when the tolling theory is based on a type of fraud, including fraudulent concealment, because of the requirement under federal and State law that fraud be pleaded with particularity. *See* Fed.R.Civ.P. 9(b); Ark. R.Civ.P. 9(b).

Under the doctrine of fraudulent concealment, if a defendant conceals from the plaintiff the existence of a cause of action, the statute of limitations is tolled. To toll the statute, the plaintiff must allege in the complaint that: (1) the defendant concealed the conduct that constitutes the cause of action; (2) defendant's concealment prevented the plaintiff from discovering the cause of action within the limita-

---

*Grain II,"* the case's second trip to the Nebraska Supreme Court.) *Lincoln Grain* also involved audits performed in consecutive years. The State Supreme Court affirmed the lower court's decision to dismiss claims based on the first two relevant years, concluding that the continuous treatment doctrine could not apply to the facts of that case. *Id.*

38. In making this argument, the FDIC is not always clear about whether it is talking about (1) a direct, actionable fraud of the sort that would appear as a separate count of the Complaint, or (2) fraudulent concealment of the malpractice claim on which this suit is actually based. The second option is the only one open to the FDIC, and the one it actually seems to want to pursue, at least most of the time. This is not a fraud case. It has not been pleaded as a fraud case, nor has the FDIC made a serious attempt to convert it into one through argument. To the contrary, the FDIC has been clear and consistent in describing the nature of its claim. In its most recent brief addressing the motion to dismiss, for example, the plaintiff states:

> [T]he thrust of the entire amended complaint is that DH & S possessed or had ready access to evidence which would have apprised it of FirstSouth's true financial condition, but *negligently* ignored or failed to properly consider that evidence and as a result, certified financial statements which were materially inaccurate, thereby depriving FirstSouth's directors and regulators of information as to FirstSouth's true financial condition.

Feb. 27 Opp. at 7 (emphasis in original). So, this is and always has been a professional negligence case. Consequently, the FDIC's tolling argument must be (and for the most part, seems to be) that the negligence that forms the basis of its claim was fraudulently concealed. The Court does not understand the FDIC to argue that the statute should be tolled because DH & S committed an independent, actionable fraud. If such an argument was presented, the Court would reject it due to the Complaint's failure to set forth a short and plain statement of the claim, let alone to plead it with particularity.

tions period; and (3) until discovery plaintiff exercised due diligence in trying to find out about the cause of action.

*Pinney Dock and Transport Co. v. Penn Cent. Corp.*, 838 F.2d 1445 (6th Cir.), *cert. denied*, 488 U.S. 880, 109 S.Ct. 196, 102 L.Ed.2d 166 (1988). *See also, e.g., Gibson v. United States*, 781 F.2d 1334, 1345 (9th Cir. 1986), *cert. denied*, 479 U.S. 1054, 107 S.Ct. 928, 93 L.Ed.2d 979 (1987); *Dymm v. Cahill*, 730 F.Supp. 1245, 1255–56 (S.D.N.Y.1990).[39] In the Court's view, the FDIC has not come close to meeting this pleading standard. The Complaint does not contain any of the required allegations; moreover, it does not contain facts which can be collected to show the necessary elements of fraudulent concealment.

The FDIC relies upon one episode to show DH & S's fraudulent concealment of its wrongdoing. At the end of fiscal 1983, First-South recorded a loan loss reserve of approximately $3.7 million. DH & S, in performing the 1983 audit, erroneously concluded that FirstSouth had sold participations worth about $1 million in a problem loan (the "Sandpiper II" loan), and that the thrift had therefore over-estimated its anticipated loss for that loan. DH & S thus instructed First-South to reduce its loan loss reserve by $1 million to a total amount of $2.7 million, which FirstSouth did. DH & S discovered its mistake after it had issued its opinion certifying that FirstSouth's 1983 Financials, which reported the $2.7 million loan loss reserve, fairly presented the thrift's financial position as of the close of fiscal 1983; nonetheless, DH & S did not require FirstSouth to restate the 1983 Financials and did not withdraw its opinion on them. Nine days

after DH & S discovered its mistake, First-South removed the Sandpiper Loans from its books without showing a loss by parking them for three months with insiders. *See* Comp. at ¶¶ 47–53. The loans were later disposed of through additional sham transactions. *See* Comp. at ¶ 54 et seq.

■ In making its fraudulent concealment argument, the FDIC states, "The Complaint alleges that DH & S engaged in a *cover-up* of its $1 million error in calculating the proper loan loss reserves for the 1983 audit." Opp. at 30. First of all, the Complaint does no such thing. It alleges that DH & S discovered its mistake and did nothing about it. It does not allege that DH & S took active steps to conceal its mistake from anyone. In fact, the Complaint does not even allege that DH & S knew about the transactions through which FirstSouth transferred the Sandpiper loans. Second, even if DH & S did do something to cover up its error, the Complaint does not allege that its effort was successful. In fact, the individuals at FirstSouth who knew about the Sandpiper loans apparently knew better than to believe the accountants; otherwise, they may not have acted so quickly and effectively to remove the loans from FirstSouth's books. Lastly, and critically, the Complaint does not allege that anyone ever took any steps to discover whether DH & S had acted wrongfully, either with respect to the Sandpiper loans or any other aspect of DH & S's work for FirstSouth, during 1983 or afterwards. Neither the Complaint nor the FDIC's arguments touch upon this due diligence requirement of pleading (and later proving) fraudulent concealment.

---

39. Arkansas law establishes a similar pleading requirement. In *Williams v. Hartje*, 827 F.2d 1203 (8th Cir.1987), the Eighth Circuit stated:

 Under Arkansas law, an affirmative action by the defendant which has the effect of fraudulently concealing the plaintiff's cause of action is effective to toll the statute of limitations. See, *e.g., Walters v. Lewis*, 276 Ark. 286, 290–91, 634 S.W.2d 129, 132 (1982). *If fraudulent concealment is properly pleaded,* the complaint is invulnerable to dismissal on limitations grounds and a fact question is created on which both sides are entitled to offer proof. *Brewer v. Hawkins*, 241 Ark. 460, 464, 408 S.W.2d 492, 494 (1966). The statute of limita-

tions begins to run no later than the day that the concealed matter was discovered. But concealment of facts, no matter how fraudulent or otherwise wrongful, has no effect on the running of the statute of limitations if the plaintiffs could have discovered the fraud or sufficient other facts on which to bring their lawsuit, through a reasonable effort on their part. *Walters v. Lewis*, 276 Ark. at 291, 634 S.W.2d at 132.

*Id.* 827 F.2d at 1205–06. The *Brewer* case, cited in *Williams*, contains a good example of a complaint that properly pleads fraudulent concealment under Arkansas law. *Brewer*, 408 S.W.2d at 494.

Turning now to the FDIC's constructive fraud theory, it is important not to lose sight of what the FDIC is arguing: that the statute of limitations should be tolled by DH & S's fraudulent concealment. At times, the FDIC seems to be arguing that it has stated a claim for constructive fraud, instead of a claim for professional negligence that was not discovered because of DH & S's conduct. The Complaint does not, intentionally or inadvertently, include a fraud count, constructive or otherwise.[40] The focus must remain, therefore, on the doctrine of fraudulent concealment.

■■■■ Arkansas law does recognize fraudulent concealment in a constructive form. For the sake of clarity, the Court will refer to this doctrine as constructive fraudulent concealment. It is most easily understood as a combination of constructive fraud and fraudulent concealment, where the fraud component of fraudulent concealment—that is, the affirmative steps the defendant takes to conceal its wrongdoing and to prevent the plaintiff from discovering the cause of action—is replaced by constructive fraud. Under Arkansas law,

> [C]onstructive fraud is succinctly defined as: 'a breach of a legal or equitable duty which, irrespective of the moral guilt of the fraud feasor, the law declared fraudulent because of its tendency to deceive others . . . Neither actual dishonesty of purpose nor intent to deceive is an essential element of constructive fraud.'

*Davis v. Davis,* 291 Ark. 473, 725 S.W.2d 845, 847 (1987) (quoting *Lane v. Rachel,* 239 Ark. 400, 389 S.W.2d 621 (1965)). Thus, constructive fraudulent concealment occurs when the breach of a certain legal or equitable duty—which the law declares fraudulent because of its tendency to deceive—prevents the duly diligent would-be plaintiff from discovering an available cause of action. The constructively fraudulent breach of duty simply replaces the requirement of affirmative and intentional fraudulent conduct. Having clarified this legal principle, the Court can now take up the FDIC's argument.

■■■ First, the Court does not believe that the Complaint alleges a breach of duty which would constitute constructive fraud. The only duty the Complaint discusses (and it contains a separate section entitled "DH & S's Duties") is the duty to exercise professional care.[41] The FDIC argues that in alleging that DH & S breached its duty to report FirstSouth's financial position accurately, the Complaint alleges constructive fraud. The Court disagrees. If the FDIC was correct, not just any negligence committed by an accountant, but any negligence involving any form of communication, would constitute constructive fraud. Arkansas law does not view every breach of a legal or equitable duty which might deceive others as constructive fraud. As the definition quoted above states, the breach must be one that the law declares fraudulent. To the Court's knowledge, the law has not declared the kind of breach of duty the FDIC has described in its Complaint as fraudulent, and the law will not be stretched to do so here.[42]

**40.** If the FDIC had stated an independent claim based upon actual or constructive fraud, then it might have a different or additional argument for tolling the statute of limitations. "Equitable estoppel in the limitations setting is sometimes called fraudulent concealment, but must not be confused with efforts by a defendant in a fraud case to conceal the fraud. To the extent that such efforts succeed, they postpone the date of accrual by preventing the plaintiff from discovering that he was a victim of fraud." *Cada v. Baxter Healthcare Corp.,* 920 F.2d 446, 451 (7th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2916, 115 L.Ed.2d 1079 (1991).

**41.** Actually, the FDIC breaks down the duty to exercise professional care into more task-specific duties, e.g., "a duty to report any way in which FirstSouth's financial statements did not fairly

present the institution's financial position...." *See* Opp. at 31. That duty to perform a particular type of work competently, however, is just a component of DH & S's general duty to exercise the skill and care expected of professional accountants.

**42.** In setting forth the broad definitions of fraud and constructive fraud, the Arkansas Supreme Court noted, "Courts have always been reluctant to define 'fraud' (either actual or constructive) lest man's fertile mind invent a new scheme outside the definition but just as nefarious as previously denounced schemes." *Arkansas Valley Compress & Wharehouse Co. v. Morgan,* 217 Ark. 161, 164, 229 S.W.2d 133 (1950). When dealing with a deliberately vague legal standard, a court must exercise caution and common sense. The FDIC set out to state a claim for

■ The FDIC argues that "[w]hen a professional has a duty to speak, nondisclosure amounts to fraudulent concealment for the purpose of tolling the statute of limitations. *Investors Funding*, 523 F.Supp. at 548." Opp. at 30.[43] That statement fails to appreciate the distinction between fraud (constructive or actual) as a cause of action and fraudulent concealment (constructive or actual) as a tolling doctrine. If the FDIC was correct, a fraudulent or constructively fraudulent act would suspend a limitations period indefinitely. The mere fraud or breach of duty, as the FDIC suggests, would toll the statute. But that is not the law. Whether a cause of action is based on fraud or anything else, tolling due to concealment lasts only as long as the duly diligent plaintiff would not discover the existence of its legal claim. As soon as discovery has occurred or reasonably should occur, the doctrine of fraudulent concealment ceases to operate. *See Wehrman v. United States*, 830 F.2d 1480, 1483 (8th Cir.1987) ("[C]oncealment, if fraudulent, prevents the running of the statutory period until the plaintiff discovers or by reasonable diligence could discover the basis for the claim."); *Walters v. Lewis*, 276 Ark. 286, 634 S.W.2d 129, 132 (1982) (cause of action accrues when basis of claim "was discovered, or should have been discovered, with the exercise of reasonable diligence."); *Hughes v. McCann*, 13 Ark.App. 28, 678 S.W.2d 784, 786–87 (1984) (same). Significantly, the FDIC's statement—like its Complaint and its arguments—neglects the element of fraudulent concealment that involves the prospective plaintiff's knowledge and conduct.

*Investors Funding*, the case the FDIC cites in support of its position, actually helps to demonstrate the inaccuracy of its statement that a professional's breach of a duty to speak "amounts to fraudulent concealment for the purpose of tolling the statute of limitations." *Id.* In *Investors Funding*, the defendant accountants argued that the fraudulent concealment doctrine should not apply because (among other reasons) the plaintiff's complaint failed to allege "specific acts of fraudulent concealment" by the accountants. The Court rejected that argument, stating: "New York law appears to be that nondisclosure may trigger the doctrine where, as here, the defendant is a fiduciary and has a duty to speak." *Investors Funding*, 523 F.Supp. at 548. In the fiduciary context, a "plaintiff need not plead facts showing active concealment by defendants, but rather, 'he need only show that he remained in ignorance of the fraud of his fiduciaries *without any fault or want of due diligence or care on his part.*'" *Dymm v. Cahill*, 730 F.Supp. 1245, 1256 (S.D.N.Y.1990) (emphasis added) (quoting *Klein v. Spear, Leeds & Kellogg*, 306 F.Supp. 743, 749 (S.D.N.Y.1969)).

■ In this case, the FDIC has not alleged that DH & S was in a fiduciary relationship with FirstSouth. And even if a fiduciary relationship did exist—a question the Court has not considered and expresses no view of here [44]—the FDIC would still have failed to plead adequate facts to show fraudulent concealment. When a breach of fiduciary duty is involved, a plaintiff would not need to plead active concealment. That is what the court stated in *Investors Funding, supra.*[45] Similarly, when constructive fraud is

professional negligence, and it did so. Its brief attempt to translate its negligence claim into a claim for constructive fraud merely demonstrates how a broadly defined cause of action can be misused. The FDIC is arguing, in effect, that in stating its claim for negligence, it just happened to plead a form of fraud.

**43.** The FDIC follows its reference to *Investors Funding* with a citation of a 1934 Arkansas case involving a physician who left a ball of gauze in his patient's abdomen. The case does not merit discussion here.

**44.** For contrasting views of whether accountants owe their clients a fiduciary duty, compare *Stain-*

*ton v. Tarantino*, 637 F.Supp. 1051, 1066 (E.D.Pa.1986) (Under Pennsylvania law, "An accountant is not automatically a fiduciary." Plaintiff-clients must prove existence of confidential relationship involving "surrender [of] substantial control over some portion of their business affairs to another."), to *In the Matter of DeLorean Motor Co.*, 56 B.R. 936, 945 (E.D.Mich. 1986) (Under Michigan law, "When performing audits, accountants are in the position of fiduciaries with their clients.")

**45.** Some jurisdictions do not follow the rule, stated in *Investors Funding*, that silence in the context of a fiduciary or confidential relationship is enough to create a possibility of fraudulent

involved, a plaintiff would not need to plead that the defendant acted, or failed to act, with an intent to deceive. Constructive fraud, like the breach of a fiduciary duty, eliminates the requirement to make allegations regarding a defendant's affirmative and intentional conduct. In order to plead fraudulent concealment, however, the plaintiff must still describe its own experience; it must still allege that the defendant's wrongdoing was not discovered, and could not have been discovered through the exercise of due diligence. The breach of a fiduciary duty, like the breach of a duty that constitutes constructive fraud (which it may be), does not relieve the plaintiff of its responsibility to plead, and later to prove, that concealment did occur "without any fault or want of due diligence or care on his part." *Dymm, supra.* The FDIC's Complaint and arguments do not mention who, if anyone, was ignorant of DH & S's negligence, nor do they describe any efforts that were made to detect wrongdoing, nor do they allege that such efforts, if undertaken, would not have been successful. For this reason, the Court concludes that the FDIC has failed to plead actual or constructive fraudulent concealment, and that the statute of limitations cannot be tolled by that doctrine.

Accepting the allegations set forth in the Complaint as true, and viewing them in the light most favorable to the plaintiff, the Complaint fails to show why the statute of limitations should not bar the portion of the FDIC's claim which is based on DH & S's performance of the 1983 audit. That part of the claim, then, must be dismissed at this point.

## VI.

IT IS THEREFORE ORDERED that Deloitte's motion to dismiss FDIC's first amended complaint be, and it is hereby, GRANTED IN PART and DENIED IN PART, in accordance with the terms of this Order.

---

concealment. In *Goellner v. Butler,* 836 F.2d 426 (8th Cir.1988), for example, the Eighth Circuit, applying Minnesota law in a medical malpractice, fraud, and products liability case, stated:

> In the presence of a fiduciary or confidential relationship, a false denial of knowledge or information by one who is in possession of the facts may result in liability, if its effect is to lead the potential plaintiff to believe that the facts do not exist or cannot be discovered. In no case, however, is the mere silence or failure to disclose sufficient in itself to constitute fraudulent concealment.

*Id.* at 431 (quotations and citations omitted). Arkansas has permitted tolling when a defendant did no more than fail to make a legally required disclosure, *see, e.g., Hyde v. Quinn,* 298 Ark. 569, 769 S.W.2d 24, 25 (1989), but again, that does not alleviate the plaintiff's need to plead that the basis for the cause of action was not discovered and could not have been discovered through reasonable diligence.